**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, *ex rel.* | : | |
| BARBARA JENKINS, | : | |
| | : | |
| Plaintiff, | : | Civil Action No.:  17-239 |
| | : | |
| v. | : | Re Document No.:  26 |
| | : | |
| SANFORD CAPITAL, LLC and | : | |
| AUBREY CARTER NOWELL, | : | |
| | : | |
| Defendants. | : | |

**MEMORANDUM OPINION**

**GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS**

This is a case under the False Claims Act ("FCA") brought by a recipient of Section 8

housing assistance, on behalf of the United States, against her landlords.  The FCA allows a

private person (a "relator") to bring an action in the Government's name, 31 U.S.C. § 3730(b),

and to recover a portion of the proceeds of the action, *id.* § 3730(d).  Among other things, the

FCA provides liability for an individual who "knowingly presents, or causes to be presented, a

false or fraudulent claim for payment or approval" to the federal government.  *Id.*

§ 3729(a)(1)(A).  Here the relator, Barbara Jenkins, alleges that Defendants violated this

provision by taking deceptive measures aimed at misleading administrators of federal housing

funds into believing that Jenkins's apartment, and others in her apartment complex, were

compliant with federal regulations when, in fact, they knew the apartment was not compliant.

This, Jenkins alleges, violated the terms of a contract between the owners of the property and the

housing administrators.  Defendant Aubrey Carter Nowell has moved to dismiss Jenkins's

Amended Complaint.[1]  The Court grants the motion in part because the Amended Complaint

fails to allege sufficient facts to establish liability under one particular theory of liability, but also

denies it in part because Jenkins has otherwise laid out a valid claim under the FCA.

## I.  BACKGROUND

### A.  Factual Background[2]

Defendants in this case are Sanford Capital, LLC and Aubrey Carter Nowell, the

principal and founder of Sanford Capital.  Am. Compl. ¶¶ 6, 8, ECF No. 12.  According to the

Amended Complaint, Sanford Capital, along with S&R Management Co.,[3] owns and operates

the Wayne Place Apartment complex in Southeast Washington, D.C.  *Id.* ¶ 15.  Defendants

collect funds from the federal government through Section 8 of the United States Housing Act,

and specifically through the Housing Choice Voucher Program administered by the District of

Columbia Housing Authority ("DCHA").  *Id.* ¶¶ 18–19.  Plaintiff Barbara Jenkins is a resident of

the Wayne Place Apartments and alleges that Defendants have violated the False Claims Act by

causing false claims to be submitted to the federal government in connection with the Section 8

voucher funds they receive.  *See* Am. Compl. ¶¶ 41–52, 55.

The Housing Choice Voucher Program, also commonly referred to as "Section 8" or the

"HCVP," was created by Congress with "the purpose of aiding low-income families in obtaining

---

[1] The other remaining Defendant, Sanford Capital, LLC, appears to have been served, but
has yet to file an appearance.  *See* Aff. of Service, ECF No. 22.

[2] A court considering a motion to dismiss for failure to state a claim assumes that the
complaint's factual allegations are true and construes them liberally in the plaintiff's favor.  *See,
e.g.*, *United States v. Philip Morris, Inc.*, 116 F. Supp. 2d 131, 135 (D.D.C. 2000). The Court
also draws on documents referenced in and integral to the complaint.  *See Marshall v. Honeywell
Tech. Solutions, Inc.*, 536 F. Supp. 2d 59, 65 (D.D.C. 2008).

[3] S&R Management Co. was originally named as a Defendant in this case but was
voluntarily dismissed from the case by Jenkins.  Relator's Notice of Voluntary Partial Dismissal,
ECF No. 17.

a decent place to live and of promoting economically mixed housing" by providing low-income families with assistance payments, or subsidies, to enable them to rent units in the private rental housing market.  42 U.S.C. § 1437f(a).  The program is financed by the federal government, regulated by the U.S. Department of Housing and Urban Development ("HUD"), and administered by state and local public housing agencies ("PHAs").  *See* 42 U.S.C. § 1437f; *Simmons v. Drew*, 716 F.2d 1160, 1161 (7th Cir. 1983).  Through the Program, HUD distributes federal funds to PHAs, and the PHAs, in turn, distribute the funds by contracting with property owners to subsidize a portion of a Program participant's rent.  *See* 42 U.S.C. § 1437f; *Simmons*, 716 F.2d at 1161.  DCHA, an agency of the District of Columbia government, is the PHA responsible for administering the Program in the District of Columbia.  *See* D.C. Code § 6–202; D.C. Mun. Regs. tit. 14, § 4900.  Under Section 8, PHAs enter into Housing Assistance Payment contracts ("HAP contracts") with owners of existing housing units.  *See* 42 U.S.C. § 1437f(d)(1).

Jenkins has lived in the Wayne Place Apartments for over twelve years.  Am. Compl. ¶ 10.  She has qualified for Section 8 assistance payments based on her annual income, and the federal government has covered "up to 100%" of her monthly rent by paying Defendants "in excess of $950.00 per month."  *Id.* ¶ 14.  According to Jenkins, all the units in the Wayne Place Apartments and "numerous other units" in eight or more other apartment complexes owned and operated by Sanford Capital participate in the HCVP as administered by DCHA.  *Id.* ¶¶ 17–19.

The alleged deceptions at the heart of Jenkins's claims began in 2008 when DCHA inspected her unit and determined it was not in compliance with regulations issued by HUD.  *Id.* ¶¶ 22–23.  The deficiencies with the unit were the landlord's responsibility to address, but the defendants only "made insignificant adjustments to the unit to give the appearance of repair," without truly addressing the problems.  *Id.* ¶ 24.  Other units similarly failed inspection but were

given only superficial treatments. *Id.* ¶ 25. In addition, the foundation of Jenkins's building was, by 2008, "in an unsafe, indecent, and unsanitary state." *Id.* ¶ 26. In 2010, Jenkins's unit again failed inspection and Defendants again "undertook efforts to give the appearance of repair when no repair was actually performed." *Id.* ¶ 27.

By 2011, Jenkins could see visible mold growing in her apartment, which she surmises was the result of water leaking throughout the building's walls. *Id.* ¶ 28. Light fixtures and electrical outlets were also filling with water. *Id.* Jenkins arranged and paid for a mold inspection of her unit and the crawl space underneath it, which confirmed there was mold throughout the "living and other portions of the unit" including the first floor and crawl space levels. *Id.* ¶¶ 29–30. According to the inspection, there was "active seepage" contributing to the "fungal growth." *Id.* ¶ 29. Defendants again "undertook efforts . . . to give the appearance" that they were fixing the problem, but did not actually make meaningful repairs. *Id.* ¶ 31. Jenkins's unit, and others at Wayne Place Apartments, failed inspection again in 2011, and Jenkins's unit was "noted to have evidence of infestation," but again Defendants only sought to make it appear that they were remedying these defects. *Id.* ¶¶ 32–34. The pattern repeated in 2013 when Jenkins's unit "failed a special inspection by the DCHA which found landlord deficiencies in water damage, mold, rodent infestation, exposed wiring, decaying material and other deficiencies" and when "Defendants again undertook fraudulent measures to give the appearance of remediation and correction." *Id.* ¶¶ 35–36. Taking matters into her own hands again in 2016, Jenkins hired a "certified industrial hygienist" who reported that her "residence does not present a safe and healthful living environment." *Id.* ¶ 37. Jenkins alleges that every building in the Wayne Place complex had the same or similar conditions. *Id.* ¶ 38.

Jenkins has attached to her Complaint a form version of a HAP contract of the kind that DCHA would have entered into with the owners of Wayne Place Apartments.  Compl. Ex. 2 ("HAP contract")[4], ECF No. 1 at 18–29; *see id.* at 1 ("The HAP contract is an agreement between the PHA and the owner of a unit occupied by an assisted family.").  According to the form, the language of the HAP contract is non-negotiable, at least in those respects that would matter in this case.  *See id.* at 1 ("Modification of the HAP contract is not permitted[.]").  The body of the contract provides that the HAP contract "is entered to provide assistance for the [resident] family under the Section 8 voucher program" and that "the PHA will pay housing assistance payments to the owner in accordance with the HAP contract."  *Id.* at 4.  The HAP contract requires the owner to enter into a lease with the family that includes certain provisions laid out by HUD, and that the lease be "consistent with state and local law."  *Id.*  Further, and most importantly here, the HAP requires that "[t]he owner must maintain the contract unit and premises in accordance with the housing quality standards (HQS)" and provides that "[t]he PHA shall not make any housing assistance payments if the contract unit does not meet the HQS, unless the owner corrects the defect within the period specified by the PHA and the PHA verifies the correction."  *Id.*

Housing quality standards are set by HUD regulations.  *See id.* (citing 24 C.F.R. § 982).  Among other things these require that "[c]eilings, walls, and floors must not have any serious defects such as severe bulging or leaning, large holes, loose surface materials, severe buckling, missing parts, or other serious damage," that "[t]he dwelling unit and its equipment must be in sanitary condition," and that "[t]he dwelling unit and its equipment must be free of vermin and

---

[4] When Jenkins amended her Complaint, she did not re-file the exhibits she had attached to her original Complaint.  However, Jenkins has still referred to these exhibits in the amended pleading.  The Court cites to the versions originally filed.

rodent infestation."  24 C.F.R. § 982.401(g)(2), (m)(1), (m)(2).  Section 8 housing is also

covered by 24 C.F.R. § 5.703, which Jenkins cites in her complaint.  *See* Am. Compl. ¶ 46

(citing 24 C.F.R. § 5.703); *see also* 24 C.F.R. § 5.701 ("This subpart applies to housing assisted

under the HUD programs listed in 24 CFR 200.853(a)."); 24 C.F.R. 200.853(a) (listing programs

including Section 8).  This section requires that "[a]ll areas and components of the housing must

be free of health and safety hazards," and that "[t]he housing must have no evidence of

infestation by rats, mice, or other vermin" or "of electrical hazards, natural hazards, or fire

hazards" and "must have proper ventilation and be free of mold, odor . . . or other observable

deficiencies."  24 C.F.R. § 5.703(f).

## B.  False Claims Act

Section 3729(a), under which Jenkins has sued, creates liability for "any person who ...

knowingly presents, or causes to be presented, a false or fraudulent claim for payment or

approval."  31 U.S.C. § 3729(a)(1)(A).  Claims under this FCA provision are known as

"presentment" claims.  *See United States ex rel. Tran v. Computer Scis. Corp.*, 53 F. Supp. 3d

104, 117 (D.D.C. 2014).  The elements of a presentment claim are that: "(1) the defendant

submitted or caused to be submitted a claim to the government, (2) the claim was false, and (3)

the defendant knew the claim was false."  *See id.* at 121–22 (citation and alteration omitted).  In

the case of the "paradigmatic . . . factually false claim," a claimant "submits information that is

untrue on its face."  *United States v. Kellogg Brown & Root Servs.*, 800 F. Supp. 2d 143, 154

(D.D.C. 2011) (citation omitted).  But a claim need not be facially false to trigger liability under

§ 3729(a)(1)(A).  *See United States ex rel. Hendow v. Univ. of Phoenix,* 461 F.3d 1166, 1170

(9th Cir. 2006).  Rather, courts have developed two theories of legal "falsity"—the implied

certification theory and the fraudulent inducement theory. *See id.* at 1170–74; *Harrison v.*

*Westinghouse Savannah River Co.,* 176 F.3d 776, 786–88 (4th Cir. 1999) (reviewing theories).

The implied certification theory proceeds from the premise that a defendant can be liable

under § 3729(a)(1)(A) for presenting a claim for payment that "rests on a false representation of

compliance with an applicable federal statute, federal regulation, or contractual term." *United*

*States v. Sci. Applications Int'l Corp.*, 626 F.3d 1257, 1266 (D.C. Cir. 2010) ("*SAIC*").

Certifications need not be express; under the implied certification theory, a party can incur

liability for making claims under a contract while "withh[olding] information about its

noncompliance with material contractual requirements." *Id.* at 1269.  Courts applying the

implied certification theory still must ensure that claims satisfy both materiality and knowledge

requirements.  A plaintiff must establish that the breached legal requirement was "a material

condition of the contract" or regulation under which the defendant made its claim for payment.

*Id.*; *see also id.* at 1271 (explaining that the plaintiff must establish that "compliance with the

legal requirement in question is material to the government's decision to pay").  While the

"existence of express contractual language specifically linking compliance to eligibility for

payment may well constitute dispositive evidence of materiality," such language is not a

"necessary condition" for liability under the implied certification theory.  *Id.* at 1269.  Likewise,

the knowledge requirement helps "ensure that ordinary breaches of contract are not converted

into FCA liability."  *Id.* at 1271.  The requisite knowledge has two dimensions: The plaintiff

must show that the defendant "knows (1) that it violated a contractual obligation, and (2) that its

compliance with that obligation was material to the government's decision to pay." *Id.*; *see also*

*United States ex rel. Heath v. AT & T*, 791 F.3d 112, 125 (D.C. Cir. 2015) (explaining that

plaintiff alleged that defendant "knew that compliance was a material and express condition for reimbursement").

Under the fraudulent inducement theory, liability attaches under § 3729(a)(1)(A) "for each claim submitted to the Government under a contract which was procured by fraud, even in the absence of evidence that the claims were fraudulent in themselves." *United States ex rel. Bettis v. Odebrecht Contractors of Cal., Inc.*, 393 F.3d 1321, 1326 (D.C. Cir. 2005) (applying theory to "claims" under pre-FERA FCA). Congress expressly recognized this theory when it amended the FCA in 1986, explaining that "each and every claim submitted under a contract . . . which was originally obtained by means of false statements or other corrupt or fraudulent conduct, or in violation of any statute or applicable regulation, constitutes a false claim." *Id.* (quoting S. Rep. No. 99-345, at 9 (1986)).

### C.  Procedural History

This case has gotten off to a slow start. Jenkins originally filed her complaint alleging that Defendants' conduct violated the False Claims Act in February of 2017. *See* Compl., ECF No. 1. In November of 2018 the United States declined to intervene in the case and the Complaint was unsealed. Notice of Election to Decline Intervention, ECF No. 8; Order, ECF No. 9. According to a status report the following summer, Jenkins's counsel was able to serve S&R Management Co., which was then a defendant in this case, but encountered difficulty serving Sanford Capital and Nowell. *See* Relator's Status Report, ECF No. 18. But shortly thereafter, S&R Management Co. was voluntarily dismissed from the case. Relator's Notice of Voluntary Partial Dismissal, ECF No. 17. In August 2019, the docket reflects that Sanford Capital and Nowell were finally served. *See* Return of Service, ECF No. 22 (Sanford Capital); Return of Service, ECF No. 23 (Nowell).

Sanford Capital has yet to appear, but Nowell has filed the instant motion to dismiss. Mot. Dismiss, ECF No. 26.  Nowell's motion not only asks that he be dismissed as a Defendant but asks the Court to "grant his Motion to Dismiss [and] enter an order dismissing the Amended False Claims Act Complaint . . . with prejudice."  *Id.*  This would, of course, end the case against Sanford Capital as well and, indeed, at least some of the arguments advanced by Nowell in his motion concern the sufficiency of Jenkins's allegations concerning Sanford Capital.  Jenkins opposes the motion, and it is now ripe for decision.

## II.  LEGAL STANDARD

The Federal Rules of Civil Procedure require that a complaint contain "a short and plain statement of the claim" in order to give the defendant fair notice of the claim and the grounds upon which it rests.  Fed. R. Civ. P. 8(a)(2); *accord Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam).  A motion to dismiss under Rule 12(b)(6) does not test a plaintiff's ultimate likelihood of success on the merits, but rather tests whether a plaintiff has properly stated a claim for which relief can be granted.  *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514–15 (2002). It is not necessary for the plaintiff to plead all elements of her prima facie case in the complaint. *See id.* at 511–14; *Bryant v. Pepco*, 730 F. Supp. 2d 25, 28–29 (D.D.C. 2010).

Nevertheless, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  This means that a plaintiff's factual allegations "must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  *Twombly*, 550 U.S. at 555–56 (citations omitted); *see also Harris v. D.C. Water & Sewer Auth.*, 791 F.3d 65, 70 (D.C. Cir. 2015) (requiring that a Title VII plaintiff

allege "facts that, taken as true, render his claim of retaliation [or discrimination] plausible").

"Threadbare recitals of the elements of a cause of action, supported by mere conclusory

statements," are therefore insufficient to withstand a motion to dismiss.  *Iqbal*, 556 U.S. at 678.

A court need not accept a plaintiff's legal conclusions as true, *see id.*, nor must a court presume

the veracity of the legal conclusions that are couched as factual allegations, *see Twombly*, 550

U.S. at 555.

Defendants here suggest that an allegation "made 'upon information and belief'" is "not

entitled to the presumption of truth on a motion to dismiss."  Reply, ECF No. 28 at 3 (citing

*Kelleher v. Dream Catcher, L.L.C.*, 221 F. Supp. 3d 157, 159 (D.D.C. 2016)).  This is not

correct.  Defendants cite a case in which facts alleged on that basis were not credited by the

Court, but they were not credited because they were "no more than '[t]hreadbare recitals'" of

certain factors relevant to the claims at hand, "supported by mere conclusory statements."

*Kelleher*, 221 F. Supp. 3d at 159 (quoting *Iqbal*, 556 U.S. at 678).  Conclusory allegations of that

sort do not suffice to state a claim, *see Iqbal*, 556 U.S. at 678, but this does not change the fact

that the Court assumes that the complaint's factual allegations are true and construes them

liberally in the plaintiff's favor when considering a motion to dismiss, provided that they are

sufficiently detailed.  *Philip Morris, Inc.*, 116 F. Supp. 2d at 135.

Plaintiffs bringing claims under the FCA must satisfy the additional pleading

requirements of Rule 9(b).  *See United States ex rel. Totten v. Bombardier Corp.*, 286 F.3d 542,

551–52 (D.C. Cir. 2002).  Rule 9(b) provides that "[i]n alleging fraud or mistake, a party must

state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).

However, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged

generally."  *Id.*  Reading Rule 9(b) together with Rule 8's requirement that allegations be "short

and plain," Fed. R. Civ. P. 8(a)(2), the D.C. Circuit has required plaintiffs to "state the time, place and content of the false misrepresentations, the fact misrepresented and what was retained or given up as a consequence of the fraud," and to "identify individuals allegedly involved in the fraud," *United States ex rel. Williams v. Martin–Baker Aircraft Co., Ltd.*, 389 F.3d 1251, 1256 (D.C. Cir. 2004) (citation omitted).

Finally, "[i]n determining whether a complaint fails to state a claim, [the Court] may consider only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which [the Court] may take judicial notice." *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997). Here, the HAP contract meets this standard.[5] It is the basis for the FCA claim because, as explained in more detail below, the central allegation is that Defendants misrepresented their compliance with housing quality standards incorporated into the HAP contract and that the claims they made to the government in connection with the Wayne Place Apartments were false in this regard. The HAP contract attached to the Complaint is a form contract, not the exact one that was signed regarding the Wayne Place Apartments or Jenkins's unit in particular, but given that the Plaintiff in this case would not have had access to the actual operative contract, and given that the form guarantees that the relevant wording may not be altered, the Court has no hesitation in considering the document as part of the motion to dismiss. In addition, "Courts in this

---

[5] The Court does not need to evaluate whether Jenkins's "certified industrial hygienist" report, which is also attached as an exhibit to her Complaint, also meets this standard. *See* Am. Compl. ¶¶ 36–37; Compl. Ex. 1, ECF No. 1 at 13–16. It is less central to her claim than the HAP contract. The information it provides concerning problems with her unit are independently stated in sufficient detail in the text of the Complaint itself. Because considering the actual report at this stage would not add anything to the sufficiency of Jenkins's claims, the Court declines to do so.

jurisdiction have frequently taken judicial notice of information posted on official public websites of government agencies." *Pharm. Res. & Mfrs. of Am. v. United States Dep't of Health & Human Servs.*, 43 F. Supp. 3d 28, 33 (D.D.C. 2014) (citing *Cannon v. District of Columbia*, 717 F.3d 200, 205 n. 2 (D.C. Cir. 2013)).  Because the HAP contract attached to the complaint is also available on HUD's website, the Court would be able to consider it even if it had not been attached.  *See* Dep't of Housing & Urban Dev., Housing Assistance Payment Contract, https://www.hud.gov/sites/documents/52641.PDF.

## III.  ANALYSIS

### A.  Legal Sufficiency

Nowell's motion focuses on whether Jenkins has alleged enough facts to make out her claim and on whether Nowell may be held liable.  The motion does not focus on whether Jenkins has laid out a legally viable theory of FCA liability more generally but, in the interest of thoroughness, the Court observes that she has done so.  Jenkins's theory of liability here is that when a landlord receives housing subsidy payments from the federal government despite noncompliance with a HAP contract, the landlord violates the FCA.  *See* Compl. ¶¶ 42–52. Leaving aside momentarily the questions of who is a proper defendant in this suit, it is clear that this amounts to a proper FCA claim against *someone*, if the facts as Jenkins alleges them are proven.  The elements of an FCA claim are present in Jenkins's Amended Complaint.  She alleges that the defendants "submitted or caused to be submitted a claim to the government" through the DC Housing Choice Voucher Program.  *Tran*, 53 F. Supp. 3d at 121–22; Am. Compl. ¶¶ 48–50.  She alleges that Defendants' representations to the government were knowingly false because, as she tells it, they took only superficial measures in response to violations of housing quality standards of which they were aware.  Am. Compl. ¶¶ 24, 31.

The most obvious FCA theory of liability for Jenkins's set of facts would be the implied certification theory, with liability arising from "a false representation of compliance with . . . [a] contractual term." *SAIC*, 626 F.3d at 1266.  A landlord could also, conceivably, be liable under a fraudulent inducement theory, if fraudulent representations were made at the time the landlord entered into the HAP contract. *See Bettis*, 393 F.3d at 1326; *see also* Am. Compl. ¶ 49 (referencing Defendants' "reckless disregard for . . . truthfulness or lack thereof in signing the HAP Contract").  Courts in a number of districts have found FCA liability under similar circumstances. *See United States ex rel. Carmichael v. Gregory*, 270 F. Supp. 3d 67, 71–72 (D.D.C. 2017) (entering default judgment against landlord on FCA claim premised on collection of payments from a tenant in excess of the amount permitted under the landlord's HAP contract); *Kelly v. Denault*, 374 F. Supp. 3d 884, 888–92 (N.D. Cal 2018) (denying a motion to dismiss and strike a FCA claim premised on a defendant landlord's receipt of Section 8 funds while in breach of HAP contract terms requiring compliance with state and local law); *see also Doe v. Gormley*, No. 15-cv-2183, 2016 WL 4400301, at *5 (D. Md. Aug. 17, 2016) (noting that "[i]n applying the false certification theory [of FCA liability], several courts have held that collecting illegal side-rent, in the context of housing voucher programs, violates the FCA" and citing cases holding similarly).

Nowell does not challenge whether Jenkins has met the additional pleading requirements of Rule 9(b).  But the Court observes that "the precise details of individual claims are not, as a categorical rule, an indispensable requirement of a viable False Claims Act complaint." *Heath*, 791 F.3d at 126.  "The central question, instead, is whether the complaint alleges 'particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted.'" *Id.* (quoting *United States ex rel. Grubbs v.*

*Kanneganti*, 565 F.3d 180, 190 (5th Cir. 2009)).  "[I]dentifying details about specific payments is less important to put the defendant on notice" in an FCA claim than in certain common law or securities fraud cases.  *Id.* at 125.  Here, Jenkins has alleged the rough dates of certain inspections that she says her unit failed and has alleged that consciously inadequate repairs were made after each poor inspection.  The fact that Jenkins continued to live in the unit raises the implication that claims were submitted for Section 8 funds because her rent must have been paid from somewhere, and she did not pay it.  Defendants do not dispute this aspect of the case, and thus the Court need not determine it.

While Jenkins's central theory of FCA liability is in broad terms coherent and lays out a general basis for liability, her Amended Complaint reflects some confusion regarding how the claims are structured and presented.  Count One of Jenkins's Amended Complaint is for violation of the FCA, and alleges that "each Defendant is individually liable" under 31 U.S.C. § 3729(a).  Am. Compl. ¶ 54.  Count Two is titled "Piercing the Corporate Veil" and puts forward an argument that Nowell is using Sanford Capital as an alter ego as a means to avoid liability.  *Id.* ¶¶ 56–63.  This is not properly structured as a separate count, and the Court does not construe it as adding an additional cause of action to the case.

Courts have sometimes referred to a plaintiff's having "stated a claim for piercing the corporate veil."  *E.g.*, *Partridge v. Am. Hosp. Mgmt. Co., LLC*, 289 F. Supp. 3d 1, 14 (D.D.C. 2017).  However, piercing the corporate veil is not a *claim*, but is properly understood as a theory by which an individual or parent corporation can be held liable for an alleged violation committed more directly by a (different) corporation.  *See Piercing the Corporate Veil*, Black's Law Dictionary (11th ed. 2019) ("The judicial act of imposing personal liability on otherwise immune corporate officers, directors, or shareholders for the corporation's wrongful acts.");

*Kelleher v, Dream Catcher, L.L.C.*, 263 F. Supp. 3d 322, 324 (D.D.C. 2017) (referencing "an alter ego, or veil-piercing, theory of liability"); *Meta Engineers, P.C. v. Wilmot, Bower & Assoc., Inc.*, No. 86-cv-2953, 1987 WL 9523, at *2 (D.D.C. Mar. 31, 1987) ("'Piercing the corporate veil' is not a cause of action.").  When courts have referred to a "count" or "claim" for piercing the corporate veil there is always, necessarily, an underlying claim based on conduct committed through the corporation the defendant allegedly used as a veil.  *See, e.g.*, *Winmar Construction, Inc. v. Kasemir*, 233 F. Supp. 3d 53, 60 n.5 (D.D.C. 2017) (quoting briefing that described an alternative theory of liability that would hold an individual "liable for the judgment against [a corporation]" as "a piercing the corporate veil claim"); *Partridge*, 289 F. Supp. 3d at 11–14 (declining to dismiss an individual defendant based on a veil-piercing theory where the alleged veil corporation was alleged to have breached an employment contract); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Sorac, Inc.*, No. 90-cv-606, 1992 WL 182268, at *2 (D.D.C. July 14, 1992) (describing an ostensibly separate count for "piercing the corporate veil" that challenged the same fraud-related conduct as other counts).

In Count Two, Jenkins appears to be asking that Nowell be held liable for Sanford Capital's FCA violation as described in Count One.  This is in some respects redundant because Nowell was already alleged to have violated the FCA in Count One, which sought to hold "each Defendant," including Nowell, "individually liable."  Am. Compl. ¶ 54.  Count Two articulates the theory by which Nowell might be held liable for Sanford Capital's FCA violation but does not challenge separate conduct or advance a different cause of action.  Jenkins is obligated to explain this theory of liability in her Complaint, but it does not amount to a second count.

Although Jenkins has not framed her Complaint in the most natural manner, it suffices under the liberal pleading standard articulated in Rule 8.  Fed R. Civ. P. 8(a)(2)(f) (requiring only

"a short and plain statement of the claim showing that the pleader is entitled to relief," and instructing courts to construe complaints "so . . . as to do substantial justice"). The Court understands her to be alleging two claims for the FCA violations articulated in Count One, one against Sanford Capital and one against Nowell, and to have advanced a veil-piercing theory of liability by which Nowell could be held liable for Sanford Capital's violation. With Jenkins's claims thus clarified, the Court can proceed to address Nowell's motion.

## B. Nowell's Factual Arguments

Nowell makes two general arguments for dismissal. First, he argues that Jenkins has failed to allege sufficient facts to support her FCA claim because the Complaint does not articulate a sufficient connection between Nowell or Sanford Capital and the Wayne Place Apartments. Mem. in Supp. of Def.' Nowell's Mot. Dismiss at 4 ("Mot. Dismiss Mem."), ECF No. 26-1. Second, he argues that even if a claim has been stated against Sanford Capital, there is no basis for piercing the corporate veil and imposing liability on Nowell himself. *Id.* at 5–9. The Court addresses each argument in turn.

Nowell's first argument relies on the fact that "Sanford Capital does not own" the Wayne Place Apartments and that payments for Jenkins's unit went to Wayne Place, LLC not to Sanford Capital. *Id.* at 4. The Amended Complaint does not mention Wayne Place, LLC. Because Nowell is only alleged to have had a connection to Sanford Capital, he argues that "the Amended Complaint is devoid of any well-pled allegations tying Mr. Nowell to the housing voucher payments at issue." *Id.* As an initial matter, this argument fails to credit the allegations in the complaint, which state that Sanford Capital owns the Wayne Place Apartments, along with dismissed party S&R Management, Co. Am. Compl. ¶ 15. And Nowell is alleged to be the

"Principal and Founder of Sanford Capital." *Id.* ¶ 8.  In this sense the Complaint lays out a fairly straight line from the property to Nowell.

Defendants suggest that the Amended Complaint is simply wrong about who owns the Wayne Place Apartments.  Nowell attempts to establish that Sanford Capital does not own the apartment complex, and attaches to his motion a deed and a letter from DCHA indicating that Wayne Place, LLC owned the Wayne Place Apartments and was the entity receiving funding in connection with Jenkins's unit.  *See* Mot. Dismiss Mem. at 4 (citing *id.* Exs. A & B, ECF Nos. 26-2 and -3).  Even assuming, as Nowell argues in his reply, that the deed is a public record of which the Court can take judicial notice and that the Court could consider it and conclude that Wayne Place, LLC owns the complex, Nowell's argument would nonetheless fail because it overlooks the basis for FCA liability alleged in the Amended Complaint.

The Amended Complaint contains sufficient facts that, if true, could make Sanford Capital liable for causing false claims to be presented to the government even if it did not own the complex.  While the Amended Complaint does state that "Defendants . . . receive[d] federal funding pursuant to Section 8," Am. Compl. ¶ 40, this is not what makes them potentially liable.  Sanford Capital is also alleged to "operate[]" Wayne Place Apartments, *id.* ¶ 17, which would put it in a position to carry out the deceptions alleged, even if it had no ownership interest in the apartments.  "Defendants," meaning Sanford Capital and Nowell, are alleged to have undertaken superficial repairs that they knew did not fix the underlying problems with Jenkins's and other units.  *See* Am. Compl. ¶¶ 24, 25, 27, 31, 34, 36.  Thus it is alleged that "[e]ach Defendant caused false claims to be submitted."  *Id.* ¶ 55.  None of this requires ownership.

The FCA has a broad reach, and the deceptive practices outlined in the Amended Complaint are enough to fall within its ambit at least at this early stage.  The FCA creates

liability for "any person who . . . causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A).  This does not require that the Defendant be the one who directly submits the claim or who receives the payout.  "[T]he FCA's provisions, 'considered together, indicate a purpose to reach any person who knowingly assisted in causing the government to pay claims which were grounded in fraud, without regard to whether that person had direct contractual relations with the government.'" *United States ex rel. Westrick v. Second Chance Body Armor, Inc.*, 266 F. Supp. 3d 110, 126 (D.D.C. 2017) (quoting *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 544–45 (1943), *superseded by statute on other grounds*, Act of Dec. 23, 1943, Pub. L. No. 78–213, 57 Stat. 609, *as recognized in Schindler Elevator Corp. v. United States ex rel. Kirk*, 563 U.S. 401, 412 (2011)).

Plaintiffs claiming that a defendant caused false claims to be presented to the government must "allege that the defendant's conduct was 'at least a substantial factor in causing, if not the but-for cause of, submission of false claims.'"  *Tran*, 53 F. Supp. 3d at 126 (quoting *United States v. Toyobo Co. Ltd.,* 811 F. Supp. 2d 37, 48 (D.D.C. 2011)).  This allows for a suit against "anyone who knowingly participates in causing the federal government to pay a false claim," including, for example, "subcontractors who cause general contractors to present false claims" or defendants whose policies of withholding refunds that they should have granted caused others to submit claims to the government that are "grounded in fraud."  *United States ex rel. Long v. SCS Bus. & Tech. Inst.*, 999 F. Supp. 78, 90–91 (D.D.C. 1998), *rev'd on other grounds*, 173 F.3d 870 (D.C. Cir. 1999) (citing *United States v. Bornstein*, 423 U.S. 303, 309 (1976); *United States v. Teeven*, 862 F. Supp. 1200, 1223 (D. Del. 1992)); *see also Tran*, 53 F. Supp. 3d at 126–27 (citing additional examples).

The course of conduct alleged in the Complaint, whereby Defendants deceptively took only superficial steps to remedy regulatory violations identified by DCHA while Wayne Place, LLC continued to take payments from DCHA that depended on the buildings' compliance with those regulations, is in line with these examples.  The fact that the Defendants here are not the owners of the building is immaterial because their deception was plausibly a substantial factor leading to the submission of false claims.  This suffices to state a claim pursuant to Rule 12(b)(6).

Nowell's second argument seeks to separate his personal liability from that of Sanford Capital by arguing that "the request to pierce the corporate veil . . . fails as a matter of law." Reply, ECF No. 28 at 6.  Federal common law governs the issue of veil-piercing when, as is the case in all FCA suits, "some federal interest is implicated by the veil piercing inquiry."  *United States v. Emor*, 850 F. Supp. 2d 176, 205 (D.D.C. 2012) (quoting *United States Through the Small Bus. Admin. v. Trotter,* 731 F.2d 8, 12 (D.C. Cir. 1984)).  "The D.C. Circuit employs a two-prong test to determine whether federal common law supports piercing the corporate veil: (1) is there such a unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist?; and (2) if the acts are treated as those of the corporation alone, will an inequitable result follow?"  *Id.* (quoting *United States ex rel. Siewick v. Jamieson Sci. & Engineering, Inc.*, 191 F. Supp. 2d 17, 21 (D.D.C. 2002) (internal quotation marks omitted)).  This is often described as the alter ego doctrine and applies "when 'the corporation, rather than being a distinct, responsible entity, is in fact the alter ego or business conduit of the person in control.'"  *Kelleher*, 263 F. Supp. 3d at 324 (quoting *Labadie Coal Co. v. Black*, 672 F.2d 92, 97 (D.C. Cir. 1982)).  "Individuals or other entities may be held liable for the activities of a corporation when it is demonstrated that 'the corporation is not only controlled

by those persons who are alleged alter egos of the corporation, but also that the separateness of the persons and the corporation has ceased and . . . an adherence to the fiction of the separate existence of the corporation would sanction a fraud or promote injustice.'" *Shapiro, Lifschitz & Schram, P.C. v. Hazard*, 90 F. Supp. 2d 15, 23 (D.D.C. 2000) (quoting *Camacho v. 1440 Rhode Island Ave. Corp.*, 620 A.2d 242, 249 (D.C. 1993)).  Courts also consider such factors as, "(1) whether corporate formalities have been disregarded, (2) whether corporate funds and assets have been extensively intermingled with personal assets, (3) inadequate initial capitalization, and (4) fraudulent use of the corporation to protect personal business from the claims of creditors." *McWilliams Ballard, Inc. v. Broadway Mgmt. Co., Inc.*, 636 F. Supp. 2d 1, 8 (D.D.C. 2009) (quoting *Estate of Raleigh v. Mitchell*, 947 A.2d 464, 471 (D.C. 2008)).

Jenkins has failed to allege sufficient facts to make out a plausible case for veil-piercing. Veil-piercing and alter ego liability can be taken off the table at the motion to dismiss stage if a complaint includes only "'[t]hreadbare recitals' of the factors courts must consider in deciding whether the corporation is the alter ego of its shareholders . . . supported by mere conclusory statements." *Kelleher*, 221 F. Supp. 3d at 159 (citing *Estate of Raleigh*, 947 A.2d at 470–71 and then quoting *Iqbal*, 556 U.S. at 678).  Much of what the Amended Complaint has to say about the relationship between Nowell and Sanford Capital is threadbare and conclusory.  Jenkins alleges in Count Two that "Nowell is the sole Principal and Founder of Sanford Capital, LLC and dominates the corporation," that "Nowell and Sanford Capital have unified interests," that "Sanford Capital is currently undercapitalized" and that "[a]dherence to the traditional protections of Sanford Capital's structure will lead to an evasion of Sanford Capital's legal obligation to Plaintiff and promote injustice."  Am. Compl. ¶¶ 57, 58, 61, 63.  These allegations repeat nearly word-for-word the factors identified in this Circuit's caselaw.  There is somewhat

more detail in Jenkins's allegations that "Nowell transferred all of Sanford Capital's assets to either himself or his wife" and that "[i]n the past, Mr. Nowell declared another one of his entities bankrupt allegedly in bad faith to avoid other enforcement actions," *id.* ¶¶ 59, 62, but not much. In *Kelleher v. Dream Catcher, L.L.C.*, 221 F. Supp. 3d 157 (D.D.C. 2016) this Court granted a motion to dismiss individual defendants from a case where the only allegations supporting alter ego liability were comparable conclusory statements parroting the established factors, plus the fact that the corporation and the individuals shared an address.  *See id.* at 159.

To plausibly allege alter ego liability, Jenkins would need to have included somewhat more detail regarding the relationship between Nowell and Sanford Capital.[6]  This might have included his role at and control over the corporation, or an explanation of why or how exactly Sanford Capital is undercapitalized, or details about the assets Nowell allegedly transferred, beyond the conclusory fact that they were transferred.  *See Partridge*, 289 F. Supp. 3d at 13–14 (denying a motion to dismiss a theory of veil-piercing liability based on the inclusion of these sorts of allegations); *McWilliams Ballard*, 636 F. Supp. 2d at 9 (same).  As it stands, Jenkins's allegations concerning the relationship between the two defendants are too conclusory.  The motion to dismiss is therefore granted with regard to the theory of veil-piercing liability.

While the Court grants the motion in part, it is not entirely clear that dismissal of the veil-piercing liability accomplishes very much for Nowell, as the Amended Complaint alleges that both defendants, not just Sanford Capital, undertook the deceptive acts that gave rise to the fraud. *E.g.* Am. Compl. ¶ 24 ("Defendants made insignificant adjustments to the unit to give the appearance of repair.").  The Amended Complaint states a claim for violation of the FCA against both Sanford Capital and Nowell in Count One.  Either, or both, could have caused the

---

[6] If Jenkins is able to do this, she can seek leave to further amend her Complaint.

presentation of claims that fall within the broad reach of the FCA described above.  Accordingly, there is not necessarily any need for piercing the corporate veil in order to hold Nowell accountable.  *See also Joe Hand Promotions, Inc. v. Wright*, 963 F. Supp. 2d 26, 28 (D.D.C. 2013) ("[A] large body of cases—and, indeed, what appears to be the great weight of authority—suggests that an individual corporate officer may be held liable for a corporation's infringing acts under the FCA without veil piercing as long as the complaint "establish[es] that the individual had a 'right and ability to supervise' the violations, as well as an obvious and direct financial interest in the misconduct." (quoting *Circuito Cerrado, Inc. v. Pizzeria y Pupuseria Santa Rosita, Inc.,* 804 F. Supp. 2d 108, 112–13 (E.D.N.Y. 2011)).  The dismissal of the veil-piercing theory will only make a difference if Sanford Capital is proven to have engaged in FCA violations but Nowell is not.

## IV.  CONCLUSION

For the foregoing reasons, Defendant Aubrey Carter Nowell's Motion to Dismiss (ECF No. 26) is **GRANTED IN PART AND DENIED IN PART**.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated: September 10, 2020                                RUDOLPH CONTRERAS
                                                        United States District Judge